# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

|  |  |
|---|---|
| **SCHILLER D. HILL,** | ) |
|  | ) |
| **v.** | )  CASE NO: 1:25-MC-19 |
|  | ) |
| **UNITED STATES OF AMERICA,** | ) |
| Respondent. | ) |
|  | ) |
|  | ) |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR RETURN OF SEIZED PROPERTY

## Table of Contents

Table of Authorities — 2

Factual Background — 4

Summary of Legal Issues — 7

Argument — 9

    I. CBP Unlawfully Compelled the Production of Passcodes to Unlock the Seized Smartphones, in Violation of the Fifth Amendment — 9

    II. The Search of Mr. Hill's Smartphones Exceeded the Bounds of the Routine Border Search Exception to the Fourth Amendment — 12

    III. The Nature, Scope, and Duration of the Smartphone Search Render It a Nonroutine and Unreasonable Border Search — 14

    IV. Searches of Smartphones Receive Heightened Protection After Riley v. California — 19

    V. CBP Cannot Rely on the Border Search Exception to Enforce State Law — 22

    VI. Virginia Code § 18.2-361.01 is Unconstitutional and Federal Enforcement Violates the First Amendment — 24

Conclusion — 26

## **Table of Authorities**

Cases

- *Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002) – p. 25

- *Boyd v. United States*, 116 U.S. 616 (1886) – p. 12

- *Byars v. United States*, 273 U.S. 28 (1927) – pp. 23, 26

- *Carroll v. United States*, 267 U.S. 132 (1925) – p. 12

- *Doe v. United States*, 487 U.S. 201 (1988) – p. 9

- *Elkins v. United States*, 364 U.S. 206 (1960) – pp. 23, 26

- *Gambino v. United States*, 275 U.S. 310 (1927) – p. 23

- *In re Grand Jury Subpoena Duces Tecum Dated Mar. 25, 2011*, 670 F.3d 1335 (11th Cir. 2012)

  – p. 10

- *Ramsden v. United States*, 2 F.3d 322, 324 (9th Cir. 1993) – p. 8

- *Ramsey v. United States*, 431 U.S. 606 (1977) – pp. 12, 22, 23

- *Rea v. United States*, 350 U.S. 214 (1956) – pp. 23, 24

- *Riley v. California*, 134 S. Ct. 2473 (2014) – pp. 19, 20, 22

- *Stanley v. Georgia*, 394 U.S. 557 (1969) – p. 25

- *State v. Rutter*, 6 Ohio Dec. Reprint 101 (1817) – p. 23

- *United States v. Aigbekaen*, 943 F.3d 713 (4th Cir. 2019) – pp. 12, 15, 21, 22, 24

- *United States v. Brown*, 125 F.4th 1186 (D.C. Cir. 2025) – pp. 9, 10, 11

- *United States v. Cano*, 934 F.3d 1002 (9th Cir. 2019) – pp. 12, 14, 17, 18, 22

- *United States v. Garcia*, 65 F.3d 17 (4th Cir. 1995) – p. 8

- *United States v. Hubbell,* 530 U.S. 27 (2000) – pp. 10, 11

- *United States v. Kastigar*, 406 U.S. 441 (1972) – p. 9

- *United States v. Kirschner*, 823 F. Supp. 2d 665 (E.D. Mich. 2010) – p. 11

- *United States v. Kolsuz*, 890 F.3d 133 (4th Cir. 2018) – pp. 12, 13, 14, 15, 16, 21, 22

- *United States v. Mendez*, 103 F.4th 1303 (7th Cir. 2024) – pp. 13, 14, 15, 18, 20, 21

- *United States v. Montoya de Hernandez*, 473 U.S. 531 (1985) – pp. 12, 13, 16

- *United States v. Nkongho*, 107 F.4th 373 (4th Cir. 2024) – pp. 12, 15, 16, 20, 21, 23

- *United States v. Oloyede*, 933 F.3d 302 (4th Cir. 2019) – p. 11

- *United States v. Payne*, 99 F.4th 495 (9th Cir. 2024) – p. 10

- *United States v. Place*, 462 U.S. 696 (1983) – p. 16

- *United States v. Robinson*, No. 23-CR-192 (NRM) (E.D.N.Y. May 9, 2025) – pp. 14, 22

- *United States v. Smith*, 673 F. Supp. 3d 381 (S.D.N.Y. 2023) – pp. 14, 22

- *United States v. Stevens*, 559 U.S. 460 (2010) – pp. 24, 25

- *United States v. Sultanov*, 742 F. Supp. 3d 258 (E.D.N.Y. 2024) – pp. 5, 14, 22

Statutes / Codes

- Va. Code § 18.2-361.01 – pp. 6, 8, 25

Rules

- Fed. R. Crim. P. 41(g) – pp. 7, 8, 25, 26

Other Authorities

- U.S. CUSTOMS & BORDER PROT., CBP DIRECTIVE NO. 3340-049A, BORDER SEARCH OF ELECTRONIC DEVICES (2018) – p. 20

- U.S. CUSTOMS & BORDER PROT., JANUARY 2025 FOIA PRODUCTION TO BRENNAN CENTER FOR JUSTICE – p. 5

**<u>Factual Background</u>**

On August 20, 2025, Mr. Schiller D. Hill, a U.S. citizen, arrived back home from a recreational trip to Europe. His flight from Lisbon, Portugal landed at the Washington Dulles International Airport ("IAD") at around 4:30 p.m. Upon disembarkation from their flight, the occupants of Mr. Hill's airplane were ushered to go through inspection by U.S. Customs and Border Protection ("CBP").

Mr. Hill stood in the Mobile Passport Control ("MPC") lane for customs inspection — a curated, expedited lane for travelers who submit their passport and customs declaration via the free MPC app, allowing them to bypass a longer traditional line. Mr. Hill has used the MPC mobile application multiple times previously while traveling internationally.

Mr. Hill was traveling with his girlfriend, also a U.S. citizen. She was first in the CBP line and upon being checked by agents was asked whether she was traveling with anyone. She stated that she was, with her boyfriend, pointing to Mr. Hill. In response, the CBP agent called over to Mr. Hill to come to the front. The agent asked for Mr. Hill to present his passport and immediately requested Mr. Hill to hand over a mobile phone that Mr. Hill was holding in his hand. This occurred around 5:00 p.m. The CBP agents then proceeded to put the phone into an acrylic container with a red cover, and instructed Mr. Hill to follow a red line that led to a different, segregated CBP area of the airport.

In the segregated CBP area of the airport, Mr. Hill and his girlfriend waited until he was called over by another agent. Mr. Hill was interrogated about his trip and his luggage. For purposes of this motion, nothing remarkable or notable stood out about the initial interrogation, which concentrated on issues typically related to border control.

At around 5:30 p.m., Mr. Hill was taken to an area where his luggage was searched in front of him. Immediately following the luggage search, during which time additional electronic devices were discovered, Mr. Hill was told that the agents were going to perform a search of all of his electronic devices and that he did not have an option to refuse. It was only at that point that a CBP agent explained to Mr. Hill that he was selected for a "random CBP screening" and handed CBP flyers to that effect.

In total, one laptop, two smartphones, and a smartwatch were confiscated for the intended search. While Mr. Hill was standing over his luggage, that had just been searched, he was advised by a CBP agent that he was required to provide a passcode to the agents to unlock all of the seized smartphones. Mr. Hill did not respond to this request. The agent then repeated, multiple times, that Mr. Hill was required to provide his passcode to the agents. After multiple demands were made under the color of the law, Mr. Hill provided the passcodes.[1]



Both smartphones were locked with a drawing pattern that required the unique sequential connection of 6 out of 9 dots that were visible on the unlock screen. Mr. Hill had to verbally explain how to draw the pattern for each smartphone while the CBP agent wrote down notes for himself on how to draw the pattern.

*Demonstration of a 9-dot lock pattern screen*

Mr. Hill was not advised of his right against compelled self-incrimination.

---

[1] A CBP training pamphlet, produced in January 2025 to the Brennan Center for Justice pursuant to a FOIA request, confirms that CBP agents are trained to request travelers' smartphone passcodes under color of law. *See* U.S. Customs & Border Prot., *January 2025 FOIA Production to Brennan Center for Justice* [p.12]*, Brennan Ctr. for Justice v. Dep't of Homeland Sec.*, No. 23-cv-5372 (S.D.N.Y. 2025) (redacted), https://www.cbp.gov/sites/default/files/2025-01.production_1_brennan_center_v_dhs_et_al_complaint_23cv5372_redacted.pdf (last visited Sept. 17, 2025). *See also United States v. Sultanov*, 742 F. Supp. 3d 258, 271 (E.D.N.Y. 2024)(CBP agent admitted to telling the traveler, "I need your password to perform a search," "to conduct an exam," possibly twice, "I need your pass code to complete ... the inspection.")

CBP agents also continued to hold his passport — Mr. Hill was not free to leave.

Mr. Hill was then told to go back to the waiting area of the segregated CBP zone in the airport. He was not offered food or water. Mr. Hill was not permitted to observe the search of his electronic devices in the way that he was taken to observe the search of his luggage.

Around 10:40 p.m., Mr. Hill started asking "what is going on" and seeking an update from the CBP agents guarding the area. He was told that there is no update. The agents around him advised him that they did not know what was taking so long. After that, CBP agents offered food and water to Mr. Hill and his girlfriend.

Around 12:40 a.m. on August 21, 2025, Mr. Hill was brought into a backroom with two government agents, different from the agents he dealt with on the afternoon of August 20. The agents sat him down and told him that "around forty illegal videos" were found on a smartphone. He was then advised of his rights. Mr. Hill invoked his rights and made no statements. Mr. Hill was then arrested and taken to a Loudoun County jail, which is where he first learned that he was being charged with a local state offense.

Mr. Hill was taken in front of a Loudoun County magistrate around 2:40 a.m. and charged with four felony offenses under Va. Code § 18.2-361.01 for the possession of video depictions of persons engaged in obscene acts with animals. The cases are now pending a preliminary hearing in the Loudoun County General District Court.

Metropolitan Washington Airports Authority ("MWAA") Detective Luis Castellon swore out the Criminal Complaint before a magistrate, describing in the affidavit portion the following relevant facts:

- He responded to U.S. Customs reporting that a passenger was in possession of "downloaded videos of animals having sexual contact between a person/human."

- The agent described the quantity as "at least 40."

- The "downloaded videos were located inside the accused's cellular phones by CBP officer while conducting routine border search of passenger's electronic devices."

Detective Castellon also filled out a Department of Homeland Security ("DHS") Form 6051D, a "Detention Notice and Custody Receipt for Detained Property" form, writing the date as August 21, 2025 and listing the seizure of four of Mr. Hill's digital devices, including a laptop, smartwatch, and two smartphones. The reason for the detention that he listed on the form was "border search." The individual identifying receipt number is 2682837. *See* Exhibit A (redacted).

| 17. Reason for Detention: Border Search | | | | | | |
|---|---|---|---|---|---|---|
| 18. Tests or Inquiries to be Conducted: | | | | | | |
| **19. PROPERTY** (By Line Item) Attach DHS Form 58 if conveyance | | | | | | |
| a. Line Item No. | b. Description | c. Packages Number   Type | d. Measurement Qty.      UM | e. Est. Dom. Value | f. Samples Sent to DHS Lab | Date |
| 001 | Acer laptop | 1   ea | | $ | Yes ☐  No ☐ | / / |
| 002 | One Plus 13 Smartphone | 1   ea | | $ | Yes ☐  No ☐ | / / |
| 003 | One Plus 10T Smartphone | 1   ea | | $ | Yes ☐  No ☐ | / / |
| 004 | Samsung Smartwatch | 1   ea | | $ | Yes ☐  No ☐ | / / |
| 20. Detaining Officer Name | | #147  Det L. Castellon | | | | 08/21/25 |
| Print | | | Signature | | | Date |

## Summary of Legal Issues

Pursuant to Rule 41(g) of the Federal Rules of Criminal Procedure, Mr. Schiller D. Hill seeks equitable relief for the unlawful search, seizure, and continued detention of his personal property by U.S. Customs and Border Protection and the Department of Homeland Security.

Rule 41(g) authorizes this Court to order the return of property where the government has acted outside constitutional bounds, particularly when, as here, no federal criminal charges or investigations are pending. *See Ramsden v. United States*, 2 F.3d 322, 324 (9th Cir. 1993), *cert. denied*, 114 S. Ct. 1624 (1994). Mr. Hill's motion is for the return of all four items listed as seized on DHS Form 6051D No. 2682837. *See* Exhibit A (redacted). Since Mr. Hill's property was seized at Washington Dulles International Airport, which spans Loudoun and Fairfax Counties, the proper district for redress under Rule 41(g) is the Eastern District of Virginia, Alexandria Division. *See United States v. Garcia*, 65 F.3d 17 (4th Cir. 1995).

This motion raises three core constitutional issues. First, CBP agents compelled Mr. Hill to recite and explain his smartphone passcodes, a classic testimonial communication in violation of the Fifth Amendment. Second, the nearly eight-hour detention and intrusive examination of his electronic devices—absent reasonable suspicion of any customs or immigration offense—exceeded the bounds of the border search exception and constituted an unreasonable search under the Fourth Amendment. Third, the government's continued seizure of Mr. Hill's devices serves no sovereign interest but instead serves to assist the Commonwealth of Virginia in its prosecution of Virginia Code § 18.2-361.01, a relatively new state statute, enacted in 2022, that conflicts with First Amendment precedent.

The Supreme Court and Fourth Circuit have consistently held that the border search exception is narrow, tethered to sovereign interests such as protecting national security, enforcing customs and immigration laws, and intercepting contraband. Here, all four judicially recognized limits—purpose, authority, scope, and duration—were transgressed. The compelled passcodes,

the prolonged and invasive search, and the federal government's assistance in enforcing an unconstitutional state law, place this seizure far outside constitutional boundaries.

For these reasons, the Court should grant Mr. Hill's motion and order the immediate return of the four items identified on DHS Form 6051D No. 2682837. *See* Exhibit A (redacted).

## Argument

In this case, CBP agents used their special and limited powers intended to protect the government's sovereignty interests at the border to enforce an unconstitutional Virginia state law.

### I. CBP Unlawfully Compelled the Production of Passcodes to Unlock the Seized Smartphones, in Violation of the Fifth Amendment

CBP agents compelled Mr. Hill to disclose the dot-pattern passcodes to his seized smartphones, telling him he had no right to refuse. Mr. Hill was compelled to reveal, recite, and explain the drawing patterns to the CBP agents. Yet, contrary to how CBP trains its agents, government agents do not have authority to compel travelers to provide a passcode.

The Fifth Amendment "protects against any disclosures which the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used." *Kastigar v. United States*, 406 U.S. 441, 445 (1972). Testimonial communications are those that, "explicitly or implicitly, relate a factual assertion or disclose information." *Doe v. United States*, 487 U.S. 201, 210 (1988). Compelled production of a pattern drawing passcode to a smartphone that is about to be searched by federal agents fits squarely into Fifth Amendment protection against compelled testimony. *See United States v. Brown*, 125 F.4th 1186, 1201 (D.C.

Cir. 2025) ("the compelled opening of the cellphone was incriminating" because it identifies the suspect "as the likely owner of, and a person with access to and control" of both the phone and its content).

In *Brown*, a federal agent directed the defendant to open a seized smartphone. *Brown*, 125 F.4th at 1203. The D.C. Circuit concluded that by doing so, the government compelled the defendant to incriminate himself "by disclosing his knowledge of how the phone could be opened" and by compelling him to reveal "his understanding" of how to unlock the device. *Id*. The compelled opening of the smartphone forced the defendant to implicitly testify to both his control over the phone and the content it contained. *Id*. at 1204. Accordingly, the Court held that the "compelled unlocking of the phone was testimonial" and in violation of the defendant's Fifth Amendment protections. *Id*.

The compelled recitation of a dot-pattern passcode is classic testimonial self-incrimination. As the Supreme Court explained in *Hubbell*, "telling an inquisitor the combination to a wall safe" is testimonial, unlike surrendering a key. *United States v. Hubbell*, 530 U.S. 27, 43 (2000). There is no appellate case known to undersigned counsel that has ever held that passcodes are non-testimonial, let alone ones that require a drawing. To the contrary, every appellate decision, even ones considering biometric unlocking, appear to view passcodes as testimonial. *See Brown*, 125 F.4th at 1201–04; *United States v. Payne*, 99 F.4th 495, 513 (9th Cir. 2024) (noting that law enforcement demanding a suspect "to independently select the finger" to use as his biometric identifier to open a mobile phone would raise compulsion issues under the Fifth Amendment); *In re Grand Jury Subpoena Duces Tecum Dated Mar. 25, 2011*, 670 F.3d 1335, 1342-45 (11th Cir. 2012) (holding that compelled decryption, which is akin to using a

passcode to unlock digital files, invokes the Fifth Amendment). *See also United States v. Kirschner*, 823 F. Supp. 2d 665 (E.D. Mich. 2010) (holding that a password was testimonial and that compelling the production of a password was akin to "seeking testimony from the Defendant, requiring him to divulge through his mental processes his password — that will be used to incriminate him").

The Fourth Circuit has not opined directly on the issue of agents compelling a suspect to provide a passcode, but hinted in a hypothetical in *United States v. Oloyede*, 933 F.3d 302 (4th Cir. 2019) how it would rule:

> Unlike a circumstance, for example, in which she gave the passcode to the agent for the agent to enter, here she simply used the unexpressed contents of her mind to type in the passcode herself. *See United States v. Hubbell*, 530 U.S. 27, 43, 120 S.Ct. 2037, 147 L.Ed.2d 24 (2000) (distinguishing "surrender[ing] the key to a strongbox," which is not communicative, from "telling an inquisitor the combination to a wall safe," which is communicative).

*Oloyede*, 933 F.3d at 309.

The Fourth Circuit in *Oloyede* distinguished between entering a passcode oneself and reciting it for an agent to enter, noting the latter is testimonial. Mr. Hill's case presents precisely that scenario. Schiller Hill was compelled to recite how to draw his passcodes to an agent, for the agent to learn the six-dot pattern connection to then duplicate the drawing on the screen of the seized smartphones in order to search them.

Considering the persuasive authorities on this issue, and that the Fourth Circuit's specific notation about a compelled recitation of an unlocking code to a government agent, Mr. Hill urges this court to find that the compelled recitation of a smartphone's passcode is testimonial, compelled self-incrimination in violation of his Fifth Amendment rights. This violation renders

any subsequent search unlawful and unusable in a court of law. *See United States v. Hubbell*, 530 U.S. 27, 46 (2000); *United States v. Brown*, 125 F.4th 1186, 1207 (D.C. Cir. 2025). Mr. Hill's seized property, therefore, should be returned to him.

## II. The Search of Mr. Hill's Smartphones Exceeded the Bounds of the Routine Border Search Exception to the Fourth Amendment

The border search exception to the Fourth Amendment applies only to *routine* inspections at the border conducted by agents expressly authorized to enforce customs and immigration laws. *See United States v. Ramsey*, 431 U.S. 606 (1977); *United States v. Montoya de Hernandez*, 473 U.S. 531 (1985); *United States v. Kolsuz*, 890 F.3d 133 (4th Cir. 2018); *United States v. Nkongho*, 107 F.4th 373 (4th Cir. 2024).

The border search exception is narrow in scope and cannot be stretched to justify unlimited or intrusive searches untethered from sovereign interests. *See United States v. Cano*, 934 F.3d 1002, 1013 (9th Cir. 2019); *United States v. Aigbekaen*, 943 F.3d 713, 720-21 (4th Cir. 2019); *see also Carroll v. United States,* 267 U.S. 132, 154 (1925) (quoting *Boyd v. United States*, 116 U.S. 616, 623 (1886)).

Courts have articulated four critical limitations on the border search exception:

1. **Purpose** — The search must serve sovereign interests such as protecting national security, enforcing immigration laws, or intercepting contraband. *See United States v. Flores-Montano*, 541 U.S. 149, 153 (2004); *United States v. Kolsuz*, 890 F.3d 133, 143 (4th Cir. 2018).

2. **Authority** — Only federal agents authorized to enforce border laws may invoke the exception. *See United States v. Cano*, 934 F.3d 1002 (9th Cir. 2019).

3.  **Duration** — The search must be brief and cannot be extended without suspicion of a customs or immigration violation. *See United States v. Montoya de Hernandez*, 473 U.S. 531, 541 (1985); *United States v. Mendez*, 103 F.4th 1303, 1310 (7th Cir. 2024).

4.  **Scope** – Only routine, limited inspections at ports of entry are permitted; prolonged, invasive, or non-routine searches fall outside the exception. *See United States v. Montoya de Hernandez*, 473 U.S. 531, 541 (1985); *United States v. Kolsuz*, 890 F.3d 133, 141 (4th Cir. 2018); *United States v. Mendez*, 103 F.4th 1303, 1310 (7th Cir. 2024).

The search of Mr. Hill's smartphones began under the guise of a routine border inspection but quickly departed from these constitutional limits. The agents uncovered no evidence of a customs or immigration violation. Instead, they sought and pursued evidence of a Virginia state offense—an unconstitutional law, as discussed *infra* in subsection VI. Even if the initial seizure could be justified as permissible under the border search exception, the subsequent conduct of CBP agents plainly exceeded the exception's bounds.

Agents compelled Mr. Hill to disclose and explain his unique drawing-pattern passcodes, conduct that directly implicated the Fifth Amendment. They then subjected his devices to an invasive examination that spanned nearly eight hours, all without any indication of a customs or immigration violation. Ultimately, DHS continued to seize and hold Mr. Hill's property solely on the basis of state charges.

Each of the four judicially recognized limits on the border search exception was transgressed here. The **purpose** of the search was abandoned once agents pursued a state obscenity offense rather than federal border concerns. The **authority** of CBP officers was exceeded when they used limited sovereign powers to gather evidence for a state prosecution. The **duration** of the search and seizure—stretching into the early morning hours, giving agents

sufficient time to pursue the full contents of the phones—was unreasonably prolonged. And the **scope** of the inspection, which included compelled passcodes and complete, exhaustive searches of the digital devices, expanded well beyond a routine border search.

Each violation independently disqualifies this search from the protection of the border search exception. Taken together, they demonstrate an unlawful expansion of federal authority that transformed a border inspection into a fishing expedition for state law enforcement. The Fourth Amendment does not permit such a result.

### III. The Nature, Scope, and Duration of the Smartphone Search Render It a Nonroutine and Unreasonable Border Search

The Fourth Circuit has recognized two categories of smartphone searches at the border. The first is a manual "thumbing" of the phone through contents such as call logs, text messages, and the photos album. *See, e.g., United States v. Cano*, 934 F.3d 1002, 1009 (9th Cir. 2019); *United States v. Mendez*, 103 F.4th 1303, 1310 (7th Cir. 2024). This type of search is done without connecting the smartphone to any technology that would aid the agents in their search. The handful of appellate cases that have reviewed this issue have described this as "routine" and have not required any level of suspicion to justify a "manual" search of smartphones at the border that fall into this category. Of note, the Fourth Circuit has not fully considered this issue. *See United States v. Kolsuz*, 890 F.3d 133, n.2 (4th Cir. 2018).[2]

---

[2] Notably, judges in the Southern District and Eastern District of New York have recently ruled that a warrant was required for even a routine search of a smartphone. *See United States v. Smith*, 673 F. Supp. 3d 381 (S.D.N.Y. 2023); *United States v. Sultanov*, 742 F. Supp. 3d 258 (E.D.N.Y. 2024); *United States v. Robinson*, Case No. 23-CR-192 (NRM) (E.D.N.Y. May 9, 2025).

The second category is a forensic search, in which agents connect the phone to external technology that copies or processes its data. *See, e.g., United States v. Kolsuz*, 890 F.3d 133 (4th Cir. 2018). Searches that fall into this category are considered "so attenuated from the rationale for the border search exception" that they fall outside the limitations of the exception and are considered nonroutine. *Kolsuz*, 890 F.3d at 143. While the Fourth Circuit remains nebulous on what exact level of suspicion is required to justify a nonroutine search, the case law shows that *at least* a minimal level of reasonable suspicion is required; and, that suspicion must have a nexus to a sovereignty law violation. *United States v. Nkongho*, 107 F.4th 373, 382 (4th Cir. 2024) ("neither *Kolsuz* nor *Aigbekaen* decided whether reasonable suspicion is enough to justify a forensic search or whether probable cause is required").

Mr. Hill was not permitted to observe the search of his phone and cannot present to the court how CBP agents searched his phone. If Mr. Hill's phone was searched through connection to an external technology then the CBP would have to have had at least reasonable suspicion of a cross-border crime under the Fourth Circuit standard. There is no evidence in this case to support the existence of reasonable suspicion of a border crime violation.

If Mr. Hill's phone was searched manually, it was searched manually for almost *eight hours*. The considerable period of time spent on searching Mr. Hill's phone rendered the search of the phone nonroutine under the Seventh Circuit standard, which recently opined on the brevity of smartphone searches in the category of routine border searches. *United States v. Mendez*, 103 F.4th 1303, 1310 (7th Cir. 2024) (finding a manual border search of a phone that lasted 30 minutes to fall within the border search exception to the Fourth Amendment, emphasizing the brevity of the search in its analysis). In *Mendez,* the Court specifically highlighted the limited

intrusiveness of the 30-minute time period that the CBP agent spent with the traveler's smartphone in determining that the search was routine, reasoning that CBP agents "cannot download and peruse the phone's entire contents" during such a short period of time. 103 F.4th at 1310.

Indeed, time limits are inherent to Fourth Amendment exceptions. "[A] seizure reasonable at its inception must remain reasonable in scope and *duration* to satisfy the Fourth Amendment." *United States v. Kolsuz*, 890 F.3d 133, 141 (4th Cir. 2018)(emphasis added); *United States v. Montoya de Hernandez*, 473 U.S. 531, 541 (1985) (holding that a traveler being detained for 16 hours at an international border is "beyond the scope of a routine customs search"). Even if the border search of Mr. Hill's digital devices was initially permissible under the border search exception, the eight-hour duration of the search was so long in duration that it exceeded the bounds of a routine border search.

In *United States v. Place*, 462 U.S. 696 (1983), the Supreme Court concluded that even when a search falls into a Fourth Amendment exception, the duration of the search may render it constitutionally unsound. In *Place*, Airport police seized a defendant's luggage for a drug-sniffing dog test, detaining it for 90 minutes without probable cause or the owner's consent. 462 U.S. at 699. The Supreme Court held that the 90-minute detention was an unreasonable seizure because it was excessively long and the duration of the search lacked justification. *Id*. at 709. The Court noted that the duration of a government search must be minimized in order to avoid unnecessary interference with "possessory interests." *Id*. at 705.

An eight-hour search clearly violates a man's *possessory interests* in his own property by magnifying the intrusion described in *Place*. Echoing this same language, the Fourth Circuit

stated that "[a] traveler has a strong possessory interest in her phone and other electronic devices." *United States v. Nkongho*, 107 F.4th 373, 382 (4th Cir. 2024).

An eight-hour period is sufficient time for CBP agents to review the entire contents of Mr. Hill's smartphones. The depth of such exploration is impossible during a routine 30-minute scroll-through. Such a protracted fishing expedition does not fall squarely into either category carved out by the Fourth Circuit, as discussed *supra*. The Ninth Circuit, however, had an opportunity to explore a third category of border search cases that more closely fit circumstances like the one in Mr. Hill's case.

In *United States v. Cano,* the Ninth Circuit carved out a third category of searches that begin as routine, manual searches but then cross the line into nonroutine searches. *See United States v. Cano*, 934 F.3d 1002 (9th Cir. 2019).

> Agent Medrano conducted a second manual search of the phone log and text messages on Cano's phone. Medrano, however, did more than thumb through the phone consistent with a search for contraband. He also recorded phone numbers found in the call log, and he photographed two messages received after Cano had reached the border. Those actions have no connection whatsoever to digital contraband. Criminals may hide contraband in unexpected places, so it was reasonable for the two HSI officers to open the phone's call log to verify that the log contained a list of phone numbers and not surreptitious images or videos. But the border search exception does not justify Agent Medrano's recording of the phone numbers and text messages for further processing, because that action has no connection to ensuring that the phone lacks digital contraband. Accordingly, to the extent that Agent Medrano's search of Cano's phone went beyond a verification that the phone lacked digital contraband, the search exceeded the proper scope of a border search and was unreasonable as a border search under the Fourth Amendment.

*Id*. at 1019.

The similarity between the facts of the *Cano* case and the situation at hand, based on what is apparent, is that the CBP agents didn't just search the phones for *the equivalent of an entire work shift* in hours — they also created notes or communications for MWAA Detective

Castellon. There was processing of data from Mr. Hill's electronic devices that went far beyond a standard scroll-through. The scope of the search of Mr. Hill's devices went far beyond what would be possible in a routine border search.

Cano opined that "to conduct a more intrusive, forensic cell phone search border officials must reasonably suspect that the cell phone to be searched itself contains contraband," applying a reasonable suspicion standard to the third category of cases that begin as routine and then evolve into nonroutine. *Id*. at 1020. The contraband must be related to "importation laws," not for "general law enforcement purposes." *Id*. at 1019.  There is no evidence to warrant reasonable suspicion of any immigration, border, or importation law violation in Mr. Hill's case.

An eight-hour search is simply a non-routine customs search that implicates both privacy and possessory interests under the Fourth Amendment. Manual electronic searches at the border are typically "brief procedures" that last for minutes, not hours. *Mendez*, 103 F.4th at 1310. In *Kolsuz*, the Fourth Circuit already noted the limits of "scope and duration" on government actions, without discussing circumstances that may violate the exception. Mr. Hill now urges this court to adopt the reasoning of the Ninth Circuit in *Cano* on exceeding the scope and nature of a routine border search and the Seventh Circuit in *Mendez* on exceeding the duration of brevity in a standard border search. Under these standards, the eight-hour search is rendered nonroutine, attenuated, and unreasonable. The search of Mr. Hill's devices would require at least reasonable suspicion of a border law violation, which does not exist in this case.

## IV. Searches of Smartphones Receive Heightened Protection After *Riley v. California*

Over a decade ago, the Supreme Court differentiated smartphones from all other types of personal property with respect to the privacy implications the devices present under the Fourth Amendment:

> One of the most notable distinguishing features of modern cell phones is their immense storage capacity. Before cell phones, a search of a person was limited by physical realities and tended as a general matter to constitute only a narrow intrusion on privacy.
> […]
> The storage capacity of cell phones has several interrelated consequences for privacy. First, a cell phone collects in one place many distinct types of information — an address, a note, a prescription, a bank statement, a video — that reveal much more in combination than any isolated record. Second, a cell phone's capacity allows even just one type of information to convey far more than previously possible. The sum of an individual's private life can be reconstructed through a thousand photographs labeled with dates, locations, and descriptions; the same cannot be said of a photograph or two of loved ones tucked into a wallet. Third, the data on a phone can date back to the purchase of the phone, or even earlier. A person might carry in his pocket a slip of paper reminding him to call Mr. Jones; he would not carry a record of all his communications with Mr. Jones for the past several months, as would routinely be kept on a phone.
>
> Finally, there is an element of pervasiveness that characterizes cell phones but not physical records. Prior to the digital age, people did not typically carry a cache of sensitive personal information with them as they went about their day. Now it is the person who is not carrying a cell phone, with all that it contains, who is the exception.

*Riley v. California*, 134 S. Ct. 2473, 2489-90 (2014) ("get a warrant").

The most perceptive distinction drawn in *Riley* between smartphones and all other forms of property was the comparison of what may be carried in a pocket in 2014 to what was once stored in the home. As Chief Justice Roberts explained, a search of the pocket can now disclose far more than even the most exhaustive search of a house. *Riley*, 134 S. Ct. at 2491. He observed that modern pocket phones store all of the kinds of sensitive records once kept at home *plus* the vast categories of additional private information never before kept in the home at all —

invalidating an observation about the limited capacity of a man's pockets made by Judge Learned

Hand in 1926. *Id*. What was once true—that the home represented the most private sphere for a

person's papers and effects—no longer holds in the age of smartphones.

Over the last decade, the Circuits have applied the reasoning of *Riley* to searches of

smartphones at the border. The Fourth Circuit has opined that, "given the sheer mass of intimate

information available in a forensic search [of a smartphone], the government may rely on the

border search exception to conduct such a search in only limited circumstances." *United States v.*

*Nkongho*, 107 F.4th 373, 382 (4th Cir. 2024). Importantly, the Fourth Circuit never specifically

considered whether a manual search of a phone at the border presents the same privacy

considerations as a subsequent forensic search in a laboratory. *See United States v. Kolsuz*, 890

F.3d 133, n.2 (4th Cir. 2018).

The CBP describes a "routine," or "manual" search of a smartphone at the border as one

of an agent thumbing through the phone as a user would, without utilizing external equipment to

aid in the detection of unlawful content. CUSTOMS & BORDER PROT., CBP DIRECTIVE NO.

3340-049A, BORDER SEARCH OF ELECTRONIC DEVICES 3 (2018). The CBP does not describe

how long such a search should take. The Seventh Circuit recently described a routine, manual

search of a smartphone as lasting 30 minutes in duration. *See United States v. Mendez*, 103 F.4th

1303, 1310 (7th Cir. 2024) (finding a manual border search of a phone that lasted 30 minutes to

fall within the border search exception to the Fourth Amendment, emphasizing the brevity of the

search in its analysis). Notably, the *Mendez* decision specifically highlighted the limited

intrusiveness of the short time period that the CBP agent spent with the traveler's smartphone in

determining that the search was routine, because a "customs agent cannot download and peruse the phone's entire contents" during such a short period of time. 103 F.4th at 1310.

Mr. Hill's phone was searched for the duration of almost eight hours. There is no case on the record where such an extensive search of a traveler's phone was considered "routine." As discussed *supra*, such an extensive search provides the CBP agents with time to pursue the complete contents of the phone.

The eight-hour seizure and prolonged, detailed search of Mr. Hill's smartphones was equivalent to a forensic search in its capabilities and intrusiveness because the extensive amount of time gave the CBP agents a complete opportunity to review the full contents of Mr. Hill's smartphones without the need to connect them to external assistive technologies. The search of his phone implicated the exact parameters that *Mendez* noted as implicated more privacy protections. Accordingly, the Fourth Circuit's requirement of *at least* reasonable suspicion should apply to the long, extensive search. *See United States v. Kolsuz*, 890 F.3d 133 (4th Cir. 2018); *United States v. Aigbekaen*, 943 F.3d 713, 721 (4th Cir. 2019); *United States v. Nkongho*, 107 F.4th 373, 382 (4th Cir. 2024).

If a minimum reasonable suspicion standard was applied to this case, the fruits of the search would be immediately invalidated by the fact that the government had no reasonable suspicion of a crime that would justify the intrusive search.

Even if the eight-hour seizure and search of the smartphones were determined too differentiable from a forensic search and hence reasonable suspicion inapplicable, an eight-hour seizure and search implicates the Fourth Amendment's restriction on unreasonable searches that otherwise fall into an exception, as discussed *supra*.

Alternatively, if this Court deems the search of Mr. Hill's phone as routine and brief, a standard of at least reasonable suspicion should still be applied. *See Riley v. California*, 134 S. Ct. 2473, 2489-90 (2014); *United States v. Kolsuz*, 890 F.3d 133, n.2 (4th Cir. 2018) (applying a minimal standard of reasonable suspicion to nonroutine smartphone searches and noting that the issue of Fourth Amendment protection of routine border searches of smartphones has not been raised on appeal). *See also United States v. Smith*, 673 F. Supp. 3d 381 (S.D.N.Y. 2023) (requiring a warrant for routine border searches of smartphones); *United States v. Sultanov*, 742 F. Supp. 3d 258 (E.D.N.Y. 2024) (same); *United States v. Robinson*, Case No. 23-CR-192 (NRM) (E.D.N.Y. May 9, 2025) (same).

### V. CBP Cannot Rely on the Border Search Exception to Enforce State Law

"The border-search exception is grounded in the recognized right of the sovereign to control, subject to substantive limitations imposed by the Constitution, who and what may enter the country." *United States v. Ramsey*, 431 U.S. 606, 620 (1977). This is a limited, particularized exception for sovereign interests that allows customs and immigration enforcement agents to conduct routine border searches without probable cause or reasonable suspicion in order to enforce U.S. customs laws and immigration laws and to protect U.S. territorial integrity. *See United States v. Flores-Montano*, 541 U.S. 149, 153 (2004); *United States v. Cano*, 934 F.3d 1002, 1019 (9th Cir. 2019). Specifically, the border search exception applies to: "protecting national security, collecting duties, blocking the entry of unwanted persons, or disrupting efforts to export or import contraband." *United States v. Aigbekaen*, 943 F.3d 713, 721 (4th Cir. 2019) (citing *Ramsey*, 431 U.S. at 620).

The Fourth Circuit has held that the border search exception does not extend to "generalized interest in law enforcement and combatting crime." *Aigbekaen*, 943 F.3d at 721. "[N]either the Supreme Court nor this court has ever authorized a warrantless border search unrelated to the sovereign interests." *Id*. at 720-21. When a search at the border is "attenuated" from sovereign interests, it will no longer fall under the exception. *Id*. at 721. "In such circumstances, the search will be unconstitutional unless accompanied by a warrant or justified under a different exception to the warrant requirement." *Id; see also United States v. Nkongho*, 107 F.4th 373, 383 (4th Cir. 2024).

Moreover, federal and state officers may not serve as agents of one another to enforce laws outside their proper jurisdiction. *Gambino v. United States*, 275 U.S. 310 (1927) (state troopers who acted solely to enforce federal law functioned as federal agents, rendering the search unconstitutional); *Byars v. United States*, 273 U.S. 28 (1927) (federal officers may not evade constitutional limits by conducting searches in concert with state officers); *Rea v. United States*, 350 U.S. 214 (1956) (federal agent enjoined from furnishing unlawfully obtained evidence to state prosecutors); *Elkins v. United States*, 364 U.S. 206 (1960) (rejecting "circuitous and indirect methods" of inter-sovereign cooperation to avoid constitutional guarantees). *See also State v. Rutter*, 6 Ohio Dec. Reprint 101 (1817) (reflecting the early American understanding that each sovereign's officers are confined to their own jurisdiction).

Here, CBP agents detained Mr. Hill and his phones for nearly eight hours, scouring his devices without any suspicion of a customs or immigration violation. No such violation was ever found, and no federal charges are pending. Instead, CBP used its limited border authority to seize

evidence for a state obscenity prosecution under Virginia law. CBP's actions were wholly untethered to sovereign interests. As *Aigbekaen* makes clear, CBP agents have no such power.

Permitting federal agents to enforce a state obscenity law would obliterate the careful line between federal and state authority. The constitutional problem is compounded by the fact that the state law itself is suspect under the First Amendment. DHS continues to hold Mr. Hill's devices solely for state prosecution, and the detention of his property is unlawful.

Moreover, the CBP agents would not be permitted to testify in a state case against Mr. Hill if the court determines that a Fourth Amendment violation has taken place. *See Rea v. United States*, 350 U.S. 214 (1956) (holding that federal officers who seized evidence in violation of federal law are enjoined from testifying in state court).

The government continues to detain Mr. Hill's property for a state law violation without any lawful authority to do so. Since no federal interest is at stake, and property is held solely for state prosecution, return under Rule 41(g) is the proper remedy.

### VI. Virginia Code § 18.2-361.01 is Unconstitutional and Federal Enforcement Violates the First Amendment

The First Amendment protects the *private possession* of pornographic materials, even ones depicting unnatural behaviors— whether we like it or not. "The First Amendment itself reflects a judgment by the American people that the benefits of its restrictions on the Government outweigh the costs. Our Constitution forecloses any attempt to revise that judgment simply on the basis that some speech is not worth it." *United States v. Stevens*, 130 S. Ct. 1577, 1585 (2010). "Whatever may be the justifications for other statutes regulating obscenity, we do

not think they reach into the privacy of one's own home. If the First Amendment means anything, it means that a State has no business telling a man, sitting alone in his own house, what books he may read or what films he may watch." *Stanley v. Georgia*, 394 U.S. 557, 565 (1969) (deciding that a State has no right "to control the moral content of a person's thoughts").

In 2010, the Supreme Court invalidated a federal law criminalizing the possession of images depicting animal cruelty. *See United States v. Stevens*, 130 S. Ct. 1577 (2010). The purpose of the law was to discourage the creation of "'crush videos,' which feature the torture and killing of helpless animals and are said to appeal to persons with a specific sexual fetish." *Id*. at 1579. Over four decades prior to that, the Supreme Court invalidated a State law that prohibited the private possession of pornographic materials. *See Stanley v. Georgia*, 394 U.S. 557 (1969) ("We hold that the First and Fourteenth Amendments prohibit making mere private possession of obscene material a crime."). A new Virginia law, Va. Code § 18.2-361.01(B)(v), enacted in 2022 — 53 years after *Stanley* and 12 years after *Stevens* — now prohibits the private possession of pornographic material when it includes bestiality content, in direct contradiction of *Stanley* and *Stevens*. The prohibitive subsection is not likely to survive an overbreadth challenge. *See Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002).

Although this Court is not being asked to strike down the Virginia statute in this Rule 41(g) proceeding, its constitutional infirmity is directly material because federal agents utilized federal resources and relied on border-search authority to enforce an unconstitutional state law. The federal agents seized Mr. Hill's property and continue to hold it solely to assist the Commonwealth of Virginia in prosecuting this unconstitutional statute, thereby rendering the validity of the Virginia statute directly relevant to the present motion. The federal agents' actions

in this case rendered the federal government an agent of the Commonwealth in its enforcement of an unconstitutional state law. *See Byars v. United States*, 273 U.S. 28 (1927) (federal officers may not evade constitutional limits by acting in agency with state officers). "To the victim it matters not whether his constitutional right has been invaded by a federal agent or by a state officer." *Elkins v. United States*, 364 U.S. 206, 215 (1960) (rejecting the "silver platter" doctrine precisely to prevent inter-sovereign end-runs around constitutional protections).

A seizure conducted under such circumstances is unprecedented and unlawful — the federal government has no authority to expend federal resources, invoke a border exception, or continue to withhold property for the purpose of enforcing a state law that is plainly unconstitutional under *Stevens* and *Stanley*.

## **Conclusion**

Mr. Hill was compelled in violation of the Fifth Amendment, his property was searched beyond the bounds of a routine border inspection in violation of the Fourth Amendment, and the federal government continues to unlawfully retain his property to enforce a state law that contravenes the First Amendment. For these reasons, Mr. Hill respectfully requests that this Court order the return of his unlawfully seized property—specifically, the four items listed on DHS Form 6051D No. 2682837, Exhibit A (redacted), pursuant to Fed. R. Crim. P. 41(g).

Respectfully submitted,

By Counsel:



_____/s/_____

MARINA MEDVIN, ESQ.
*Counsel for Schiller Hill*
MEDVIN LAW PLC
277 S Washington St | Ste 210
Alexandria, Virginia 22314
Phone: (703) 870-3300
Email: Contact@MedvinLaw.com

## CERTIFICATE OF SERVICE FOR CM/ECF

I hereby certify that on September 19, 2025, I will electronically file the foregoing with the Clerk of the Court for the United States District Court for the Eastern District of Virginia by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

_____/s/_____
Marina Medvin, Esq.